IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EDWARD STEWART,

        Petitioner,               No. CIV S-05-0458 RRB KJM P

    vs.

M. SHEPHERD,                    ORDER AND

        Respondent.        FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging Governor Gray Davis's rescission of his parole date.

I. Background

        On July 2, 1981, petitioner was sentenced to a term of fifteen-years-to-life following his conviction for second degree murder.  Answer, Ex. A (abstract of judgment).

        At his hearing before the parole board on March 13, 2002, one of the commissioners described petitioner's commitment offense.  On the day of the murder, petitioner had been drinking and taking Tranxene, a prescribed medication for pain.  Answer, Ex. C at 15-16.  Petitioner found the victim, Raoul Ortega, at a card room where Ortega was working.  Id. at 15.  About a year before, Ortega had mugged petitioner's mother and beaten her head into the sidewalk.  Id. at 17.  Ortega was acquitted or the case was dismissed.  Id. at 19.

1

1    When petitioner encountered Ortega at the card room, he asked why Ortega had

2  been harassing his mother.  Ortega pulled out a knife and said that petitioner's mother was a

3  lying bitch.  Id. at 20.  Petitioner was ejected from the club after he began to argue with Ortega.

4  Id.

5    About fifteen minutes later, petitioner returned to the cardroom and attempted to

6  enter the kitchen area, but was stopped by two waitresses.  Answer, Ex. D (portion of probation

7  report) at 4.  When Ortega came into the restaurant, petitioner shot him twice.  Ortega died at the

8  scene:  one bullet penetrated his heart while the other entered his abdomen.  Id at 5.  While

9  waiting for the police, petitioner said, in essence, that Mr. Ortega did not deserve to live after

10  what he had done to petitioner's mother.  Id. at 4.

11    Following his arrest, petitioner told police he had not intended to kill Ortega even

12  though he was angry at Ortega's treatment of his mother.  Id. at 5.  He also said that on the day of

13  the killing, he had taken ten Tranxenes and had drunk seventeen beers.  Id. at 6.

14    CDC calculated petitioner's minimum eligible parole date as September 20, 1990.

15  Chronological History.[1]  Docket No. 24-3 at 12.  Accordingly, his first parole hearing was held

16  on September 19, 1989.  Id.  Thereafter, he appeared before the Parole Board on the following

17  dates:  October 25, 1991, September 1, 1992, January 12, 1994, November 22, 1994, January 11,

18  1996, March 20, 1997, April 16, 1998 and November 15, 2000.  Id. at 12-13.  On March 13,

19  2002, petitioner was granted parole.  Docket 24-2 at 63-70.  The panel fixed his term at 252

20  months and set special conditions of parole.  Id. at 66.

21  /////

22  /////

23  /////

24

25    [1] On October 18, 2007, the court directed respondent to expand the record with the
26  materials upon which the governor relied.  The materials are not Bates-stamped, so the court will
refer to the numbers assigned by the court's ECF system, when appropriate.

1          On August 9, 2002, Governor Gray Davis reversed the Board's action in the

2   following decision:

3          On September 19, 1980, Edward Stewart was getting increasingly
           upset thinking about the beating and robbery of his mother that had
4          taken place the year before.  Mr. Stewart was drinking heavily and
           taking prescription medication to control his irritability.  That
5          evening, he went to a Sacramento restaurant that was open 24
           hours.  He took a seat in a booth and noticed Raoul Ortega, a
6          restaurant employee.  Mr. Stewart believed that Mr. Ortega looked
           like the person who committed the offense against his mother.  He
7          began following Mr. Ortega around the restaurant.  Finally, the
           restaurant supervisor asked Mr. Stewart to leave, which he did.

8
           Fifteen minutes later, Mr. Stewart returned with a loaded gun to
9          look for Mr. Ortega.  He found him sitting in the dining room area.
           He tried to get a clear shot and fired once in Mr. Ortega's direction.
10         He was uncertain whether Mr. Ortega was hit, so he fired the gun a
           second time.  Mr. Ortega was hit in the chest and abdomen before
11         he escaped to the kitchen where he collapsed.

12         Mr. Ortega's supervisor took the gun from Mr. Stewart and told
           him to sit-down and wait.  Mr. Stewart said, "I don't care.  He
13         smashed my mom's skull and stole $35.00.  No man like that
           should live."

14
           Mr. Ortega was pronounced dead by the ambulance attendant.  An
15         autopsy report found the cause of death was a gunshot wound to
           the heart.  The police recovered a .22 Magnum caliber 2-shot
16         Derringer with two spent casings.  Mr. Stewart was arrested on
           September 19, 1980.  His blood alcohol level was .20 percent.
17
           On July 2, 1981, the jury found Mr. Stewart guilty of second
18         degree murder and sentenced him to 15 years to life.

19         Mr. Stewart committed a brazen attack on Mr. Ortega that
           demonstrated a disregard for human suffering.  After spotting Mr.
20         Ortega, Mr. Stewart pursued him throughout the restaurant,
           becoming so disruptive that he was asked to leave.  He returned
21         with a loaded gun and fired two shots to ensure that he inflicted
           serious bodily injury on Mr. Ortega.  Mr. Stewart had plenty of
22         time to cool down or to contact the police if he believed Mr. Ortega
           had committed a crime.  Instead, he took the law into his own
23         hands.  At the time of sentencing, the trial court judge said it was
           not Mr. Stewart's "position to be the avenging sword of justice."
24
           Mr. Stewart's propensity for breaking the law is not only evidenced
25         by his life offense but by his criminal record.  From 1967 to 1975
           he was arrested six times for drunk driving which led to four
26         convictions.  From 1969 to 1970, he was arrested for obstructing

3

the roadway, and convicted of reckless driving.  From 1970 to 1975, he had three arrests for disturbing the peace, which led to two convictions, and one conviction for trespassing.  From 1970 to 1978, he was arrested five times for crimes that involved assaultive behavior, which led to four convictions.  In 1975, he was convicted for possession of narcotics.  The fact that Mr. Stewart was on probation when he committed five of his crimes demonstrates an inability to follow the law or benefit from prior probation opportunities.

Mr. Stewart has a history of drug and alcohol use.  In 1967, he began to drink to control the pain after he lost the use of his right arm in a motorcycle accident.  In 1971 he started using PCP.  In 1977 his intermittent use of Valium increased to regular use.  In 1980, he switched to Tranxene.  In the 1981 Probation Officer's Report, Mr. Stewart admitted to drinking nine to ten beers approximately three to four times per week.  He indicated that the day of the life offense, he drank over 17 beers and had taken about ten Tranxenes.

Early psychological evaluations determined that Mr. Stewart's alcohol and drug problems were causative factors in the commission of his crime.  Yet, Mr. Stewart's insight into the dynamics behind his alcohol and drug abuse has remained limited.  As recent [sic] as 1994, Mr. Stewart's risk for returning to drinking was determined to be "fairly high" because he still had not gained sufficient insight into his substance abuse problem.  Although he began to gain some insight in 1996, his potential for violence was dependent upon his ability to be alcohol and drug free.  In the 2000 psychological evaluation, his potential for violence was determined to be average as long as he abstained from alcohol and drug use.  Mr. Stewart has been able to remain alcohol and drug free while incarcerated, but I am concerned about his ability to maintain his gains in a less controlled environment.  There has been no determination about whether Mr. Stewart has developed coping skills to prevent a relapse.  Additionally, since 1994, there has been no assessment about his risk of relapse.  I believe Mr. Stewart should spend more time participating in alcohol and drug programs and therapy to address these issues.

Mr. Stewart continues to justify his actions.  At the 2002 parole suitability hearing, Mr. Stewart still insisted that Mr. Ortega was the man who mugged his mother.  However, the trial judge stated that the evidence showed Mr. Ortega had nothing to do with the attack on Mr. Stewart's mother.  In 1993 Mr. Stewart claimed, for the first time, that Mr. Ortega had threatened him with a knife.  At the 2002 parole suitability hearing, Mr. Stewart continued to insist that Mr. Ortega came at him with a knife.  Mr. Stewart's inability to accept responsibility for his crime is indicative of an individual who has not been fully rehabilitated.

/////

1
2

> The Sacramento Police Department is opposed to parole for Mr. Stewart.  The Department recommended that Mr. Stewart be "incarcerated for the full length of his term, which is life."

3
4
5
6
7
8

> Given the extent of Mr. Stewart's criminal record, the seriousness of his crime, and the extent of his substance abuse, I believe that Mr. Stewart could benefit from extended incarceration and additional participation in Alcoholic[s] Anonymous, Narcotics Anonymous, self-help programs and vocational programming.  He would also benefit from anger management and therapy programs.  Without additional time spent in these areas, I believe that Mr. Stewart continues to pose a significant risk of danger of public safety, if released at this time.  Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Stewart.

9

Answer, Ex. E.

10

Petitioner filed a petition for a writ of habeas corpus in Sacramento County

11

Superior Court.  The court denied the petition, filing a lengthy order, which read in pertinent part:

12
13
14

> Cal. Const., art. V, § 8(b) gives the Governor the authority to review and rescind a Board of Prison Term's [sic] grant of parole to a life prisoner.  However, the Governor's power under this provision is not unfettered, and is subject to the "some evidence" standard of review.

15
16
17
18

> In exercising his power, the Governor may consider the circumstances of the crime, and if egregious enough, these alone may support a denial of parole.  On the other hand, if no circumstance of the offense is more aggravated or violent than the minimum necessary to sustain a conviction for the offense, denial of parole on this ground alone would be improper. . . .

19
20

> The Governor is also to consider the other factors that the Board of Prison Terms is to consider in determining whether the prisoner is suitable for parole. . . . .

21

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

22

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23
24
25

> In this case, the Governor detailed his reasons for finding unsuitability.  If these are based on factually correct conclusions garnered from petitioner's record, and they meet the qualifications of 15 Cal. Code Reg. § 2402, there will be "some evidence" to support the reversal of the grant of parole.

26

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In summary, the Governor based his decision on the following:

(1) The nature of the crime, being . . . a "brazen attack" on the victim that "demonstrated a regard [sic] for human suffering." The Governor, however, then described a fairly typical second degree murder. Indeed, if there had been a sufficient cooling down period, this might well have ended in a voluntary manslaughter conviction rather than a second degree murder conviction. It is not clear that basing a denial of parole <u>solely</u> on the murder would be justified by "some evidence." However, the Governor did not base his decision solely on this, and instead found other circumstances as well, including substance abuse.

(2) Petitioner's "propensity for breaking the law," based on a criminal record more than 20 years old and that has been practically crime free ever since. This alone, under the circumstance, questionably constitutes "some evidence" to deny parole.

(3) Petitioner's past history of drug and alcohol abuse. Ordinarily, this might not continue to constitute "some evidence"to deny parole, as the past 9 years of psychological evaluations indicate that petitioner has adequately dealt with his substance abuse problems. However, because there has been no assessment about his risk of relapse, and because petitioner does suffer from phantom pain from his amputated arm there could well be a risk of relapse, it appears that the Governor's concern is in fact based on "some evidence" in the record that there is no assessment of how petitioner would fare in an uncontrolled environment due to this condition, even though not specifically mentioned by the Governor.

(4) Petitioner's continuing to justify his actions. As explained above, this is not based on a correct assessment of the record. The Governor simply is incorrect. Petitioner was not attempting to justify his actions, but to simply give his version of the facts that was consistent with his version from the very beginning and as shown by transcripts from the original court proceedings in 1980. This is <u>not</u> "some evidence" to support the Governor's decision.

(5) The Sacramento Police Department was opposed to parole for petitioner. It is not known if such opposition actually exists, as petitioner never received this and as a result it is not attached to the petition to review. Even if it actually exists, it is unclear whether under 15 Cal. Code Reg. § 2402(b), this is the type of evidence that may show unsuitability for parole to make it "some evidence" to support the Governor's reversal of parole.

/////

As discussed above, several factors considered by the Governor were not based on actual fact or are questionable as being "some evidence" to has been properly assessed as to how he would fare in an uncontrolled environment.[2] The Governor's concern over the lack of assessment of risk of relapse into substance-abuse upon release is a proper one in fact, in light of petitioner's suffering from phantom pain from the amputation of his arm.  Although not mentioned by the Governor, that fact does exist and would set petitioner apart from the average substance abuser, as this is a lifelong condition that other substance abusers do not have and could pose a risk for relapse in the future.  As such, despite the Governor's reliance on considerations that are not factually correct or alone would not constitute "some evidence," there nevertheless is "some evidence" in the record to support his decision of reversal of the grant of parole.

Answer, Ex. B at 1-10.

Neither party has submitted a copy of the Supreme Court's disposition of petitioner's state habeas petition, although respondent claims that it is part of respondent's Exhibit B.  It is not.  Neither party claims, however, that this denial was anything but a "post card denial."  See Answer at 2, 8; Pet., Points and Authorities at 9.  This court will accept the parties' representation.

II.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

/////

/////

---

[2]  This is reproduced as it appears in the copy of the Superior Court's decision attached to the answer.   The order's pagination shows that a page has not been omitted.

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  <u>See</u> <u>Ramirez v. Castro</u>, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[3]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  <u>Lockyer</u>, 538 U.S. at 71 (overruling <u>Van Tran v. Lindsey</u>, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  <u>See</u> <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is

---

[3]  In <u>Bell v. Jarvis</u>, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent <u>Bell</u> stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  <u>See</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>Ramirez</u>, 365 F.3d at 773-75.

1
2

> objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

3  <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

4  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

5  fails to cite or fails to indicate an awareness of federal law. <u>Early v. Packer</u>, 537 U.S. 3, 8

6  (2002).

7        The court will look to the last reasoned state court decision in determining

8  whether the law applied to a particular claim by the state courts was contrary to the law set forth

9  in the cases of the United States Supreme Court or whether an unreasonable application of such

10  law has occurred. <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002), <u>cert</u>. <u>dismissed</u>, 538 U.S.

11  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

12  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

13  must perform an independent review of the record to ascertain whether the state court decision

14  was objectively unreasonable. <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  In other

15  words, the court assumes the state court applied the correct law, and analyzes whether the

16  decision of the state court was based on an objectively unreasonable application of that law.

17        It is appropriate to look to lower federal court decisions to determine what law has

18  been "clearly established" by the Supreme Court and the reasonableness of a particular

19  application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

20  III.  <u>Parole In California</u>

21        In <u>Greenholtz v. Nebraska Penal Inmates</u>, 442 U.S. 1, 7, 11 (1979), the United

22  States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

23  even when a state establishes a system of conditional release from confinement.  The Court

24  recognized, however, that the structure of parole statutes might give rise to a liberty interest in

25  parole that would, in turn, mean an inmate was entitled to certain procedural protections.  <u>Id</u>. at

26  14-15.  In <u>Greenholtz</u>, the Court found that the "mandatory language and the structure of the

Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen (Allen), 482

U.S. 369, 371 (1987).

   In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used the

Greenholtz-Allen framework to determine whether California statutes created a liberty interest in

parole.  The critical statute at issue in McQuillion is California Penal Code section 3041, which

provides in relevant part:

> (a) In the case of any prisoner sentenced pursuant to any provision
> of law, other than [the determinate sentencing law], the Board of
> Prison Terms shall meet with each such inmate during the third
> year of incarceration for the purposes of reviewing the inmate's
> file, making recommendations, and documenting activities and
> conduct pertinent to granting or withholding post-conviction credit.
> One year prior to the inmate's minimum eligible parole release date
> a panel consisting of at least two commissioners of the Board of
> Prison Terms shall again meet with the inmate and shall normally
> set a parole release date as provided in Section 3041.5.[4] The release
> date shall be set in a manner that will provide uniform terms for
> offenses of similar gravity and magnitude in respect to their threat
> to the public, and that will comply with the sentencing rules that
> the Judicial Council may issue and any sentencing information
> relevant to the setting of parole release dates. The board shall
> establish criteria for the setting of parole release dates and in doing
> so shall consider the number of victims of the crime for which the
> prisoner was sentenced and other factors in mitigation or
> aggravation of the crime....

> (b) The panel or board shall set a release date unless it determines
> that the gravity of the current convicted offense or offenses, or the
> timing and gravity of current or past convicted offense or offenses,
> is such that consideration of the public safety requires a more
> lengthy period of incarceration for this individual, and that a parole
> date, therefore, cannot be fixed at this meeting.

/////

/////

/////

/////

---

[4]  Cal. Penal Code § 3041.5 establishes procedural requirements for Board hearings.

The Ninth Circuit found that subdivision (b) was like the statutes in both <u>Greenholtz</u> and <u>Allen</u>:

> California's parole scheme gives rise to a cognizable liberty interest
> in release on parole. The scheme "'creates a presumption that
> parole release will be granted'" unless the statutorily defined
> determinations are made.

<u>McQuillion</u>, 306 F.3d at 901-02.  Again in <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003), the Court of Appeals reiterated its holding that the California parole scheme created a liberty interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the question because its "language clearly parallels the language" under consideration in <u>Greenholtz</u> and <u>Allen</u>.  <u>See also</u> <u>In re Rosenkrantz</u>, 29 Cal.4th 616, 654 (2002), <u>cert. denied</u>, 538 U.S. 980 (2003) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in light of the circumstances specified by statute and regulation").

The existence of a liberty interest means that a decision to deny parole must be supported by some evidence and not be otherwise arbitrary.  <u>Superintendent v. Hill</u>, 472 U.S. 445, 457 (1985); <u>Jancsek v. Oregon Board of Parole</u>, 833 F.2d 1389, 1390 (9th Cir. 1987).  The test is "not whether some evidence supports the *reasons* . . . for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety."  <u>In re Lee</u>, 143 Cal.App.4th 1400, 1408 (2006) (emphasis in original).  The evidence must have some indicia of reliability.  <u>Biggs</u>, 334 F.3d at 915.  The "some evidence" requirement is a "minimally stringent" standard and does not require the court to reweigh the evidence or examine the entire record.  <u>Powell v. Gomez</u>, 33 F.3d 39, 40 (9th Cir. 1994); <u>Hill</u>, 472 U.S. at 455-56.

/////

/////

/////

/////

/////

> [The] analysis is framed by the statutes and regulations governing
> parole suitability determinations . . . . [W]e must look to California
> law to determine the findings that are necessary to deem a prisoner
> unsuitable for parole, and then must review the record in order to
> determine whether the state court decision holding that these
> findings were supported by "some evidence" . . . constituted an
> unreasonable application of the "some evidence standard" principle
> articulated in *Hill*.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (internal citations omitted).  When considering

a parole habeas, this court must review the record to determine whether the state court decision

was an unreasonable application of the "some evidence" principle.  Id.

The paramount concern in determining parole suitability is public safety.  In re

Dannenberg, 34 Cal.4th 1061,1080, 1084, 1085, 1086 (2005) ("the overriding statutory concern"

is for public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the

public safety implications" of the release determination).  Accordingly,

> [T]he test is not whether some evidence supports the reasons the
> Governor cites for denying parole but whether some evidence
> indicates a parolee's release unreasonably endangers public safety.
> Some evidence of the existence of a particular factor does not
> necessarily equate to some evidence the parolee's release
> unreasonably endangers public safety.

Hayward v. Marshall, 512 F.3d. 536, 543 (9th Cir. 2008) (quoting In re Lee, 143 Cal.App.4th

1400, 1408 (2006)).

The Board's regulations for setting parole release dates are found in title 15 of the

California Code of Regulations.  Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at
> the initial parole consideration hearing scheduled as provided in
> Section 2268. A parole date shall be denied if the prisoner is found
> unsuitable for parole under Section 2402(c).  A parole date shall be
> set if the prisoner is found suitable for parole under Section
> 2402(d).  A parole date set under this article shall be set in a
> manner that provides uniform terms for offenses of similar gravity
> and magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing
> Rules for the Superior Courts. The panel shall also consider the

1    criteria and guidelines set forth in this article for determining the
2    suitability for parole and the setting of parole dates, considering the
     number of victims of the crime for which the prisoner was
3    sentenced and any other circumstances in mitigation or
     aggravation.

4    The terms in this article are guidelines only. The suggested terms
     serve as the starting point for the board's consideration of each case
5    on an individual basis. The board may establish a term above or
     below the guidelines when warranted and reasons are stated on the
6    record. A prisoner shall not be released before the minimum
     eligible parole date.

7

8    15 Cal. Code Regs. § 2401.

9            Section 2402 provides:

10   (a) General. The panel shall first determine whether the life
     prisoner is suitable for release on parole. Regardless of the length
11   of time served, a life prisoner shall be found unsuitable for and
     denied parole if in the judgment of the panel the prisoner will pose
12   an unreasonable risk of danger to society if released from prison.

13   (b) Information Considered. All relevant, reliable information
     available to the panel shall be considered in determining suitability
14   for parole. Such information shall include the circumstances of the
     prisoner's social history; past and present mental state; past
15   criminal history, including involvement in other criminal
     misconduct which is reliably documented; the base and other
16   commitment offenses, including behavior before, during and after
     the crime; past and present attitude toward the crime; any
17   conditions of treatment or control, including the use of special
     conditions under which the prisoner may safely be released to the
18   community; and any other information which bears on the
     prisoner's suitability for release. Circumstances which taken alone
19   may not firmly establish unsuitability for parole may contribute to
     a pattern which results in a finding of unsuitability.

20

21   (c) Circumstances Tending to Show Unsuitability. The following
     circumstances each tend to indicate unsuitability for release. These
22   circumstances are set forth as general guidelines; the importance
     attached to any circumstance or combination of circumstances in a
     particular case is left to the judgment of the panel.  Circumstances
23   tending to indicate unsuitability include:

24   (1) Commitment Offense. The prisoner committed the offense in
     an especially heinous, atrocious or cruel manner. The factors to be
25   considered include:

26   /////

13

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

/////

/////

14

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402.

Once the Board determines that an inmate is suitable for parole, it proceeds to set a date for the inmate's release, based on numerous factors provided in sections 2403 through 2411.

As the Superior Court in this case explained, if the Board sets a parole date, the Governor may review the decision: "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." Cal. Const., Art. 5, § 8(b); see also In re Rosenkrantz, 29 Cal.4th at 639. Accordingly, "[A] governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society.'" In re Elkins, 144 Cal.App.4th 475, 499 (2006).

1    IV.  Analysis

2              Petitioner argues that his conviction for second degree murder is not more

3    egregious than other such offenses and the Governor's characterization of the offense as more

4    egregious is not supported by sufficient evidence; the decision as a whole is not supported by

5    some evidence; the Governor failed to give petitioner an individualized determination of all

6    relevant factors; and the Governor's reliance on unchanging factors–the nature of the offense and

7    petitioner's record–violates due process.

8              Respondent counters that there is no protected liberty interest in parole and that

9    the Governor's determination was supported by some evidence.

10             The Superior Court's decision found that the Governor's determination was

11   supported by his conclusion that petitioner's risk of relapse into substance abuse had not

12   adequately been explored.  Because that court rejected or questioned the Governor's other bases,

13   this court will not consider them as providing support for the governor's decision.[5]

14   _____

15        [5]  The Superior Court's analysis of these other factors is correct.  The Ninth Circuit has
     agreed that law enforcement opposition to an inmate's parole "without more, cannot be
     considered 'some evidence' under Hill that supports the Governor's reversal of parole."

16   Hayward, 512 F.3d at 545 n.9.  If opposition from the Sacramento Police Department may be
     deemed to have any bearing, it is counterbalanced by the support for parole offered by a

17   representative from the Sacramento County District Attorney's Office who attended the hearing
     and commented, "all of Mr. Stewart's troubles seem to be, originate from alcohol and drug

18   abuse.  And he has participated in programs.  There's a commendation in the report . . . showing
     successful completion. . . . [O]n the totality of the circumstances, it appears that Mr. Stewart

19   would be a reasonable candidate for parole consideration and the setting of a date."  Answer,
     Ex. C at 46.

20        The Superior Court also found the Governor's reliance on the nature of the offense and on
     petitioner's criminal record to be questionable, a conclusion with support in the law.

21   As the Superior Court observed, the murder was no more egregious than other second degree
     murders.  In re Lee, 143 Cal.App.4th 1400, 1409 (2006).  In addition, its impact has been blunted

22   by petitioner's in-prison efforts to rehabilitate himself.  Hayward, 512 F.3d at 546.  The court
     concluded petitioner's criminal record, which was more than twenty years old when the Governor

23   considered petitioner's parole, had lost its predictive impact because of the passage of time.  Id. at
     544.

24        The Superior Court took issue with the Governor's assertion that petitioner had changed
     his account of the fatal encounter with Ortega.  According to the Governor, petitioner's claim that

25   Ortega came at him with a knife was made for the first time in 1993.  The materials before the
     governor did not include a trial transcript, so it is unclear how he concluded that petitioner first

26   mentioned the knife in 1993.  Respondent has presented nothing suggesting that the Superior

The Superior Court found that some evidence supported the Governor's determination because the murder itself and petitioner's criminal record had been fueled by his drug and alcohol abuse, yet there had not been an adequate assessment of the danger that petitioner would relapse into substance abuse when released, particularly given the phantom pain he experiences in connection with the amputation of his arm.  Answer, Ex. B at 10 & Ex. E at 2-3.

The materials presented to the Governor contained the following information about petitioner's substance abuse, in reverse chronological order:

–A psychosocial assessment prepared for the November 2001 calendar notes petitioner's continued active participation in Narcotics Anonymous and predicts his "[v]iolence potential continues to be definitely very low due to Mr. Stewart's age, maturity, and time served. There are no psychosocial factors evident that would preclude his being granted a parole date at this time."  Docket No. 24-4 at 28.

– A postconviction progress report dated October 9, 2001 summarizes chronos documenting petitioner's participation in Narcotics Anonymous (NA) for 2000 and 2001. Docket No. 24-3 at 17.

– A life prisoner evaluation prepared for the April 2000 calendar  noting that petitioner "has made satisfactory use of the self-help substance abuse programs while confined at FSP-II.  His active participation in such groups, disciplinary free behavior, and his involvement in his landscape program, indicates that he would present a minimum degree of threat to the public at this time."  Docket No. 24-3 at 19.

_____

Court's evaluation of this factor, based on the trial transcript in its files, was incorrect.   Given its access to the entire trial record, the Superior Court's determination that petitioner was not attempting to justify his actions but rather to present his account of the murder does not appear incorrect.   Finally, even though the trial judge may have felt that petitioner should not have perceived himself to be an instrument of justice as the Governor claims, in 1989, that same judge told the panel that if petitioner did not have a "heavy" record, he would have "no reason to oppose" the Board's favorable consideration of parole for petitioner.  Docket No. 24-6 at 8.

1    –A psychosocial assessment prepared for the April 2000 calendar observes that

2  "Mr. Stewart has never been diagnosed with any serious mental or physical illnesses."   Docket

3  No. 24-4 at 30.  It acknowledges his use of medications for pain in the arm injured in a

4  motorcycle accident and subsequently amputated.  Id. at 31.  The diagnostic impressions include

5  an Axis I diagnosis of "Phencyclidine Abuse by History, in Remission; Alcohol Dependence by

6  History, in Remission; Alcohol Abuse by History in Remission; Sedative Hypnotic Anxiolytic

7  Abuse (Valium and Tranxene)."   The Axis III diagnosis is "Amputated Right Arm with Chronic

8  Phantom Pain."  Id.  The psychologist concluded: "In my opinion, Mr. Stewart does not pose

9  more than a normal risk factor in a controlled environment.  It is imperative that he remain in

10  Narcotics Anonymous and Alcoholics Anonymous if paroled.  No other risk factors are

11  apparent."  Id. at 31-32.

12    –A postconviction progress report dated February 17, 2000 noted that from

13  December 1996 until December 1999 petitioner has been an "active participant" in Alcoholics

14  Anonymous (AA) and NA.  Docket No. 24-3 at 20-21.

15    –A life prisoner evaluation prepared for the March 1998 calendar observed that

16  "Stewart's past criminal behavior appears to be directly related to his substance abuse.  It is noted

17  that with in the structured routine of the institutional settings Stewart has programmed

18  exceptionally well. . . . The key ingredient for his continued good behavior is a total abstinence

19  from alcohol and drugs.  To predict his adjustment to the pressures and cares of daily life outside

20  prison routine, borders on the impossible.  This writer believes that considering his commitment

21  offense, prior record, and post conviction behavior, Stewart would pose an unpredictable degree

22  of threat to the public if released at this time."   Docket No. 24-3 at 25-26.  The postconviction

23  progress report prepared at the same time notes that petitioner stopped attending AA in

24  November 1997.  Id. at 25.

25    –A psychological evaluation for the March 1998 calendar offered the same

26  diagnosis and then observed: "Mr. Stewart claims that he only drank alcohol for social reasons.

He now reports that he has 'no desire to drink.'  And he indicates that he has learned to go

without alcohol whatsoever.  Additionally, he is able to describe the impact of alcohol upon

inhibitions and realizes that alcohol does impair judgment and illuminates impulse control.  He

never took drugs until his arm was hurt and then he got 'hooked' on prescription medications

which he took for pain control."  Docket No. 24-4 at 33. The examiner described this as "an

increase in insight regarding alcohol and substance abuse."  Id.  She added that "Violence

Potential remains less than that of the average inmate and these gains would probably hold if in a

less structured setting, such as return to the community."  Id. at 34.

        –A psychological evaluation for the January 1997 calendar noted that petitioner

"continues to program quite well with no need for Mental Health Services."  Docket No. 24-4 at

35. The examiner again concludes that "Violence Potential would remain less than average as

long as he abstains from alcohol."  Id. at 36.

        –A life prisoner evaluation prepared for the January 1997 calendar notes:

"STEWART'S criminal behavior in the community appears to be directly related to his substance

abuse.  He has participated in several self help groups, particularly Alcoholic's [sic] Anonymous.

Based on his excellent prison adjustment and continued participation in Alcoholic's [sic]

Anonymous in the community, STEWART would probably pose a low degree of threat to the

public at this time if released from prison."  Docket No. 24-3 at 30.

        –A postconviction progress report dated December 2, 1996 documents petitioner's

"continued participation in Alcoholic's [sic] Anonymous."  Docket No. 24-3 at 31.

        –A Life Prisoner Evaluation prepared for the September 1995 calendar recounted

that when petitioner appeared before the parole board in 1994, the panel recommended that he

participate in self-help and therapy programming, particularly Alcoholics Anonymous, and that

petitioner has "continued his participation in alcoholics anonymous."  Docket No. 24-3 at 35-36.

The writer did note, however, that petitioner's degree of threat to the public was "unpredictable"

at that time.  Id. at 36.  A postconviction progress report from the same time recounts petitioner's

1  "active participation in A.A. during 1994." Id. at 37.

2              –A psychological evaluation prepared for the September 1995 calendar included

3  the following information:

4              Psychological evaluations over the years provide the following
              information:  Doctor Harris and Dr. Bolin, 6/30/82, noted that he
5              'had a substantial history of drug abuse, excessive alcohol intake,
              with related social behaviour (sic) control problems' and he had
6              come 'to the attention of several Sacramento Area psychiatrists as
              the result of numerous 72-hour holds at the Sacramento Medical
7              Center based on his being a danger to others and to himself.'  And
              'he was frequently diagnosed as having an Acute Organic Brain
8              Syndrome with Psychotic Symptomatology Secondary to Drug and
              Alcohol Abuse.'  These evaluators found his mental status to be
9              unremarkable and 'considerably improved' in comparison to a
              9/11/81 evaluation.  At that time they recommended a 'Category
10             'D' psychiatric study for assessment of his treatment potential.'  In
              a report dated 7/12/84, the Psychiatric Counsel [sic] at CMC-East
11             concluded Mr. Stewart is 'an individual who is dominated by his
              emotions.  The current psychological testing indicates the presence
12             of a number of impulse disorders that become aggravated under
              stressful conditions.  During his adult life in the community, he
13             totally failed to confront his emotional difficulties.  He became
              obsessed with his physical limitations and attempted to escape
14             reality through constant and excessive drug and alcohol abuse. . . .
              In the absence of alcohol and/or narcotic substances, Mr. Stewart is
15             basically a docile individual who is free of anger and hostility.  His
              violence potential is presently assessed to be significantly
16             reduced."

17             A Board of Prison Terms report dated 7/10/89 noted 'clinical
              impressions are of a man who has grown emotionally and
18             developed increased coping skills since he became involved in
              Vocational Horticulture.  It appears to be therapeutic for him."  It
19             was concluded "in a less controlled setting, such as a return to the
              community, this inmate is likely to hold present gains if he abstains
20             from alcohol and drugs."  . . . .

21             Another Psychiatric Counsel [sic] at CMC-East, 3/16/92, stressed
              their awareness of 'strong drug abuse problem that should
22             definitely not be downplayed or ignored at this time . . .our
              concerns focus strongly in this area since he does have a lengthy
23             history of substance abuse and acting out violently with low
              impulse control. . .'  And further, the Board of Prison Terms
24             Report of 7/9/92, concludes, 'this is a several alcoholic problem in
              a person of somewhat limited intellectual and emotional faculties.
25             His impulse control in the Institution has been good and he has
              been able to show some attention to study and work in the prison
26             situation. . . . The possibility of his returning to drinking on

                                    20

1    discharge is fairly good, and of course, this would enhance his
     violence potential.' Doctor Clavere, on 8/02/93, continued to see
2    violence potential as having been significantly reduced from
     greater than average.  Doctor Clavere also noted, and I agree, 'he is
3    not limited by any intellectual or emotional deficits.'

4    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6    . . . He has participated in Alcoholics Anonymous and is certainly
     intellectually aware of the effect of alcohol on inhibitions and
7    impulse control. . . . He believes he can successfully avoid alcohol
     and drugs if paroled.  He has also participated in a number of Self-
8    Help Groups and seems to have benefited [sic] from that
     experience.  Thus, the major issue becomes that of staying away
9    from alcohol and drugs. . . . Doctor Harmon, on 7/20/94, believes
     'his risk of returning to drinking (and thus increasing his violence
10   potential) is fairly high in that he does not appear to have a lot of
     understanding about addiction.  Continued education or
11   participation in a substance abuse program would hopefully be
     helpful. . . . The aspect of predicting substance abuse and
12   subsequent violence is a 'grey area' and we must be cautious about
     the accuracy of such predictions.

13

14   Docket No. 24-4 at 37-39.

15          –A postconviction progress report from September 1994 notes petitioner's

16   participation in Alcoholics Anonymous during a part of 1993.  Docket No. 24-4 at 1.

17          –The psychiatric evaluation prepared for the September 1994 calendar did, as

18   noted above, conclude that petitioner's "risk of returning to drinking (and thus increasing his

19   violence potential) is fairly high in that he does not appear to have a lot of understanding about

20   addiction."  Docket No. 24-4 at 41. The examiner also reported that petitioner "continues to state

21   that he no longer has a problem in this area.  He does feel, however, that he cannot afford to ever

22   drink ever again.  He has been attending Alcoholics Anonymous and Narcotics Anonymous, and

23   appears to be benefitting some from this.  In general, he appears to have matured considerably

24   during this process of incarceration, and over time."  Id. at 40.

25          –A life prisoner evaluation prepared for the September 1993 board calendar

26   observes that although "petitioner is not currently involved in any self-help group [,] [h]e stated as

21

far as he knows, he is on the waiting list for a Alcoholics Anonymous. [sic]" Docket No. 24-4 at 5.

  –The psychiatric evaluation prepared for the September 1993 calendar noted that he discussed the murder with "considerable rationalization" but "spontaneously expressed considerable genuine remorse for the victim and his family. . . ."  In addition, "[h]e disavowed any need for personal change, stating 'I really don't feel there's a damn thing wrong with me'; however, he presented definite plans for changing his lifestyle in society (i.e., complete abstinence) in order to avoid future conflicts."  Docket No. 24-4 at 43.  The examiners noted that "his violence potential had been estimated to have been significantly reduced from greater than average.  At present it is regarded as having remained the same."  Id.

  –A life prisoner evaluation prepared for the August 1992 calendar observes that at petitioner's 1991 board appearance, the panel recommended that he resume participation in AA, but that he "has been unable to accomplish this, largely due to his transfer to CMC at the suggestion of BPT."  Docket No. 24-4 at 9.

  –A psychiatric evaluation prepared for the August 1992 calendar referenced a March 1992 psychiatric council report "indicat[ing] that this inmate is in need of more internalize [sic] controls that might be used to keep him from drinking and forestall further violence behavior, which has been present off and on for years culminating in the committing offense.  The counsel recommended further treatment at CMC including substance abuse, self-esteem, relaxation, and assertive training programs.  The inmate himself tends to reject these recommendations.  The report also points out that he has a poor understanding of the extensive basis of his drinking."  Docket No. 24-4 at 44.  Petitioner "simply presents his reason for drinking and using PCP as a matter of controlling the pain he suffered in his arm.  His right arm was amputated in 1984 . . . in hope to alleviate the pain which it did not."  Id. The evaluator concludes that the reports from CMC "well define the seriousness of his alcoholic problem, his inability to demonstrate meaningful control measures, and seriousness of his alcoholic and drug usage.  The

undersigned is quite pessimistic about his being able to profit from the extensive program recommended by the psychiatrists at CMC but there is not much else that can be done if this man is to show any degree of rehabilitation while in the prison situation." Id. at 45.

–The 1992 Psychiatric Council Report, referenced above, added that, "Mr. Stewart does not have a very good understanding of the dynamics behind his drug and alcohol abuse. He was able to talk about the basic steps and the AA program but could not explain how he has specifically applied them to his life at this time. We definitely believed that he does have a strong drug abuse problem that should definitely not be downplayed or ignored at this time. . . .We strongly believe that his involvement in the regular Psychology Department Substance Abuse Program with the followup Process Oriented Directive Substance Abuse Group would be effective to help him to begin to look at the underlying dynamics of his problem in this area. Continued involvement in AA and NA are also strongly recommended. . . ." Docket No. 24-4 at 47. The council observed that petitioner "seemed very tentative" and not "strengthened" when discussing his plans for abstinence. Id. Outlining its recommendations for further therapy and self-help, the council observed that "he does have the potential for learning and that if he applies himself he will have much better parole prognosis after such training. We strongly recommend that Mr. Stewart refrain from any and all controlled substances and alcohol abuse in the future since his level of dangerousness would again be unpredictable if he did involve himself in alcohol or substance abuse at all." Id. at 49.

–A life prisoner evaluation for the September 1991 calendar notes that "[w]hile prisoner is a 'model' inmate and has demonstrated his ability to program in a controlled setting, exposure to mind altering substances in an uncontrolled environment may be too great a risk at this time." Docket No. 24-4 at 14. The writer recommended that petitioner continue to be involved in AA and NA. Id.

–A psychological evaluation prepared for the September 1991 calendar concludes that petitioner's "condition while incarcerated has greatly improved and would likely continue

improvement in a less controlled setting.  His violence potential had been estimated to have been

higher than average.  At present it is regarded as having been significantly reduced."  Docket No.

24-4 at 57-58.

–A postconviction progress report dated July 7, 1991 describes a chrono from

1986, documenting petitioner as "an active member of Alcoholics Anonymous while confined at

CMF-S."   Docket No. 24-4 at 15.

–A postconviction progress report dated September 19, 1989 states that

"[petitioner] joined the Ross Marsh Fellowship of Alcoholics on 7-20-87."   Docket No. 24-4 at

19.

–A psychological evaluation prepared for the September 1989 calendar notes that

while petitioner "remains in continuous pain . . . he has 'learned other ways to deal with it,' e.g.,

putting his mind on other activities like reading and horticulture."  Docket No. 24-5 at 1.

Petitioner told the evaluator that he no longer needed formal psychotherapy because he finds

horticulture to be therapeutic.  "He said, "I found something I had an interest in now–the

horticulture.  That was my whole problem all along.  I hadn't done anything for a lot of years."  Id.

at 2.  The examiner added, "[c]linical impressions are of a man who has grown emotionally and

developed increased coping skills since he became involved in vocational horticulture. . . He has

learned alternative methods of handling his pain.  He also uses his time effectively.  There are no

indications currently that he needs psychotherapy. . . He could benefit from continued

participation in A.A."  Id. at 2.

–A psychological evaluation for the August 1987 calendar noted that petitioner is

"'still looking for something to get rid of the pain. . . .He takes medications for it now, but 'that

only works for awhile.'" Docket No. 24-5 at 4. Petitioner acknowledged the role alcohol played in

the murder, but failed to recognize the role of PCP.  Id. at 5. "There is an absence of insight. . . .

He does minimize his past actions, blaming these actions instead onto alcohol."  Id. The examiner

concluded: "It is questionable that the gains subject has made in the institution will continue if

released to a less controlled setting.  If and when 'pain' becomes less centrally important in his

life, rehabilitation and training in some skill would probably be helpful."  <u>Id</u>.

       –A life prisoner evaluation prepared for the August 1987 calendar notes that

"during this period, Stewart participated in Alcoholics Anonymous with an excellent attitude and

consistency."  Docket No. 24-4 at 20-21.  The postconviction progress report prepared at the same

time mentions the pain in petitioner's right shoulder even following the amputation of his right

arm but records that petitioner is active in the AA program.  <u>Id</u>. at 22, 24.

       –A 1984 Category "X" Diagnostic Program report contained these comments from

petitioner: "He expresses concern with the likelihood that excessive drug abuse (codeine, PCP,

and Tylenol) altered his mental state and quite possibly also resulted in organic brain damage.

[He] states he now desires only to avoid reverting to substance and/or alcohol abuse and continue

to achieve greater self-respect and self-esteem during his incarceration."  Docket No. 24-4 at 51.

The evaluator continued, "As a result of his involvement in the Category "X" group sessions, he

now appears to be starting to adequately confront the fact his prolonged substance and alcohol

abuse only served to reinforce his low self-esteem and depression. . . . In comparison to the

average incarcerated felon, Mr. Stewart's violence potential is viewed as being less than

average. . . However, should Mr. Stewart reinvolve himself with alcohol or substance abuse in the

future, his level of violence potential will likely increase significantly."  <u>Id</u>. at 52.  In another part

of this report, a different evaluator described petitioner as "a drug and alcohol abuser who is

obsessed with his physical disability.  He is tense, worried and lacks energy.  In the absence of

drugs or alcohol, [he] is not aggressive, belligerent or dangerous.  Psychotherapy is desirable to

help him accept his disability and to learn a more positive attitude toward life in general."  <u>Id</u>. at

55.  The report concluded that "[i]n the absence of alcohol and/or narcotic substances, Mr. Stewart

is basically a docile individual who is free of anger and hostility.  His violence potential is

presently assessed to be significantly reduced.  The Council agrees Mr. Stewart . . . can likely gain

insight into his inadequate personality from future therapy involvement."  <u>Id</u>. at 56.

1    Contrary to the conclusions reached by the Superior Court and the Governor, the

2    psychiatrists, psychologists and other prison personnel who had interacted with petitioner over the

3    years since his initial incarceration have repeatedly addressed the risk of his relapse into substance

4    abuse, including since 1994.  Early reports show a man without a clear "understanding of the

5    extensive basis of his drinking," Docket No. 24-4 at 44, and with "an absence of insight" into the

6    role PCP played in the murder.  Docket No. 24-5 at 5.  However, as petitioner matured and

7    continued to participate in Alcoholics Anonymous and Narcotics Anonymous and as he became

8    more actively involved in the vocational horticulture program, he "learned other ways to deal with

9    [the pain],' e.g., putting his mind on other activities like reading and horticulture." Docket No. 24-

10   5 at 1.  Moreover, the psychosocial assessment for the November 2001 calendar explicitly states

11   that "[t]here are no psychological factors evident that would preclude his being granted a parole

12   date at this time," an implicit recognition that his risk for relapse was low so long as he remained

13   active in AA and NA, as all the reports over the years had recommended.  Docket No. 24-4 at 28.

14   Similarly, the life prisoner evaluation prepared in April 2000 lauded petitioner's "satisfactory use

15   of the self-help substance abuse programs," again an implicit finding that petitioner's risk of

16   relapse is low based on his embrace of AA and NA principles.   Docket No. 24-3 at 19.

17   All of the evaluations noted the link between petitioner's substance abuse and his

18   criminal record.  Some of the early evaluators were dubious about petitioner's ability to remain

19   sober outside the structure provided by incarceration; those evaluators did not recommend that

20   petitioner be paroled.  See, e.g., Docket No. 24-4 at 14.  However, as petitioner continued to

21   attend AA and NA, the evaluations changed.  The life prisoner evaluation prepared for the January

22   1997 board noted that petitioner's active participation in substance abuse programs in the

23   community would mean that the risk of his relapse was low.  Docket No. 24-3 at 30.   In the

24   psychological evaluation prepared for the March 1998 calendar, the writer predicted that

25   petitioner would be able to maintain his gains in a less structured setting, noting that petitioner

26   was now able to recognize the impact his substance abuse had on his criminal behavior.  Docket

No. 24-4 at 33.  These evaluations indeed predicted that the risk of petitioner's relapse was low so long as he attended substance abuse groups upon release.

As one California Court of Appeal has said in vacating a Governor's reversal of a Board of Prison Terms' grant of parole,

> *past* desire for and use of drugs does not by itself reasonably establish current unsuitability because there is no additional evidence to complete a chain of reasoning between his past drug use and a finding that because of it he currently poses an unreasonable risk of danger if released. In other words, in the absence of some evidence to support a reasonable belief that [petitioner] *might* start using drugs again, the fact that he used drugs extensively more than 20 years ago does not by itself represent some evidence that he is currently dangerous.
>
> Moreover, here the record does not contain any evidence to support reasonable grounds to believe [petitioner] might start using drugs if released. There is no evidence that [petitioner's] former desire for drugs might still be a motivating force. The record reveals that he has been clean and sober for a substantial period of time relative to the duration of his abuse.  There is no evidence that [petitioner] denies he had a drug problem or denied he had a problem for some period of his incarceration.  There is no evidence that he refused, failed, or did poorly in drug treatment programs.  And there is no evidence that [petitioner] ever used any type of illicit substance during his incarceration.  Nor does the record support a reasonable belief that without further drug treatment *in prison*, [petitioner] might start taking drugs again.

In re Smith, 114 Cal.App.4th 343, 371 (2003) (emphases in original).  As all those who evaluated petitioner said, parole should include special conditions for random drug and alcohol testing and for participation in NA and AA.  For the several years leading up to the Board's grant of parole, however, no evaluations indicated that petitioner required further alcohol or drug abuse treatment in prison in order to prepare him for release, even taking into account the pain associated with amputation of his arm.  As in Smith, the conclusion by the Governor and the Superior Court that the risk of petitioner's relapse had not been addressed is not supported by some evidence.

/////

/////

/////

1     IT IS HEREBY ORDERED that:

2         1.  The Federal Defender's Office is appointed to represent petitioner; and

3         2.  The Clerk of the Court is directed to serve a copy of this order on David Porter,

4  Assistant Federal Defender.

5         IT IS THEREFORE RECOMMENDED that the petition for a writ of habeas

6  corpus be granted and that petitioner be released on parole consonant with the March 13, 2002

7  determination of the Board of Prison Terms.

8         These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED:  March 31, 2008.

17

18                                          _____

19                                          U.S. MAGISTRATE JUDGE

20

21  2/stew0458.157

22

23

24

25

26